UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMANDA STAMPER, an individual, and
LAMAR LYONS, an individual,

          Plaintiffs,

     v.

M. SHAPIRO MANAGEMENT
COMPANY, LLC, a Michigan Limited
Liability Corporation and M. SHAPIRO
DEVELOPMENT COMPANY, LLC a
Michigan Limited Liability Corporation
d/b/a M. SHAPIRO REAL ESTATE
GROUP, EMILY RATHNAW, an
individual, JARED GORBACK, an
individual, ERICA SPENCER, an
individual, RUBIN CHRISMAN, an
individual, MARK KASSAB, an individual
and MIA REIKENSMEYER, an
individual,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.
Hon.

**COMPLAINT AND JURY
DEMAND**

/

Todd Russell Perkins (P55623)
PERKINS LAW GROUP, PLLC
Attorneys for Plaintiff
409 E. Jefferson, Floor 6
Detroit, MI 48226
313-964-1702
tperkins@perkinslawgroup.net

Joel B. Sklar (P38338)
LAW OFFICES OF JOEL B. SKLAR
Attorney for Plaintiff
500 Griswold, Suite 2450
Detroit, MI 48226
313-963-4529 / 313-963-9310 (fax)
joel@joelbsklarlaw.com

_____/

## COMPLAINT AND JURY DEMAND

Plaintiffs Amanda Stamper and Lamar Lyons by and through their counsel, Todd Russell Perkins of The Perkins Law Group, PLLC and Joel B. Sklar, file this Complaint and Jury Demand against Defendants M. Shapiro Management Group, LLC and M. Shapiro Development Company, LLC, doing business as M. Shapiro Real Estate Group, Emily Rathnaw, Erica Spencer, Jared Gorbeck, Rubin Chrisman, Mark Kassab, and Mia Reinkensmyer and says:

1.      Plaintiff Amanda Stamper (Stamper") is a resident of and/or transacts business in Wayne County, Michigan which is located in this Judicial District.

2.      Plaintiff Lamar Lyons ("Lyons") is a resident of and/or transacts business in Wayne County, Michigan which is located in this Judicial District.

3.      Defendant M. Shapiro Management Group LLC / M. Shapiro Development Group, LLC is a Michigan limited liability company does business in Wayne County, Michigan as "M. Shapiro Real Estate Group ("M. Shapiro")" which is located in this Judicial District.

2

4. Defendant Emily Rathnaw ("Rathnaw") is an individual who resides and/or transacts business in Wayne County, Michigan which is located in this Judicial District.

5. Defendant Erica Spencer ("Spencer") is an individual who resides and/or transacts business in Wayne County, Michigan which is located in this Judicial District.

6. Defendant Jared Gorback ("Gorback") is an individual who resides and/or transacts business in Wayne County, Michigan which is located in this Judicial District.

7. Defendant Rubin Chrisman ("Chrisman") is an individual who resides and/or transacts business in Wayne County, Michigan which is located in this Judicial District.

8. Defendant Mark Kassab is an individual who resides and or transacts business in Wayne County, Michigan which is located in this Judicial District.

9. Defendant Mia Reinkensmyer is an individual who resides and/or transacts business in Wayne County, Michigan which is located in this Judicial District.

10. All the individually named Defendants either made, influenced or participated in the adverse employment actions deliberately inflicted upon and

3

suffered by Plaintiff Amanda Stamper and acted at all times with actual or ostensible authority.

11.   Defendant M. Shapiro is liable for the acts and omissions of its employees under the doctrines of vicarious liability and *respondeat superior*.

12.   Venue is proper in this Judicial District pursuant to *28 USC §1391* because all of the acts, transactions and occurrences which form the gravamen of this Complaint took place in this Judicial District.

13.   This Court has original subject jurisdiction matter jurisdiction over Plaintiff's federal law claims pursuant to *28 USC §1331* and supplemental jurisdiction over her state law claims pursuant to *28 USC §1367(a)*.

## COMMON FACTUAL ALLEGATIONS

14.   Plaintiff Amanda Stamper ("Stamper") is a Black woman who began her employment at Lautrec Ltd., in June 2024 as a Leasing Agent for the Waynewood Apartments in the City of Westland ("Westland"), where she worked full time 5 days a week.

15.   Plaintiff Lamar Lyons ("Lyons") is a Black male and Stamper's fiancé.

16.   Plaintiffs Stamper and Lyons live together with a blended family of eight children and one newborn baby.

17.   On September 1, 2024, Lyons was hired as a janitor/maintenance man at Lautrec.

18.     The jobs were perfect for Stamper and Lyons because it was close to their home, their blended family, and their children's schools.

19.     Stamper received positive job appraisals, exceeded expectations and was a valued employee with management potential.

20.     Lyons received positive job appraisals, exceeded expectations and was a valued employee with management potential.

21.     In January 2025, M. Shapiro merged, acquired, and/or arranged with Lautrec Ltd., to manage Westland and other residential community properties, including one in Livonia.

22.     The same people who operated M. Shapiro were the same people who had operated Lautrec, Ltd.

23.     Stamper worked under the same corporate structure, management, and chain of command.

24.     Defendant Rathnaw was and remains the Property Manager at Westland and was Stamper's direct supervisor.

25.     Defendant Spencer was and remains the Property Manager at Livonia Apartments and was Stamper's direct supervisor at the Livonia site ("Livonia").

26.     Defendant Gorback was and remains M. Shapiro's Regional Manager and supervised Rathnaw and Spencer.

27. Defendant Chrisman was M. Shapiro's Director of Operations and supervised Gorback.

28. Defendant Chrisman "resigned" after Stamper reported her discovery of a microphone hidden in her office by Defendants Gorback and Spencer.

29. Defendant Kassab was and remains Defendant M. Shapiro's Senior Vice President who supervised Chrisman.

30. Defendant Reinkensmyer was and remains Defendant M. Shapiro's Director of Human Resources.

31. Sometime in the middle of February 2025, Stamper told Property Manager Rathnaw, Regional Manager Gorback and co-employees that she was pregnant.

32. Amanda Stamper was excited and happy.

33. Amanda Stamper planned to take maternity leave to care for her child under the *Family Medical Leave Act (FMLA)* being, *29 U.S.C. § 2601, et seq.*, when appropriate.

34. Defendants Rathnaw and Gorback were not happy with Stamper.

35. Defendant Rathnaw asked Stamper why she wanted another baby when she already had eight children.

36. Amanda explained that she wanted to have a child with her fiancé to add to their blended family of eight children.

6

37. On March 3, 2025, Defendant Rathnaw berated Stamper in front of co-employees.

38. Defendant Rathnaw blamed Stamper for a mistake made by another leasing agent.

39. Stamper became nauseous, physically ill, had difficulty breathing, became lightheaded, and experienced heart palpitations.

40. Defendant Rathnaw continued to yell at Stamper told her that she had made the office look "stupid."

41. Amanda's pregnancy was high-risk and she feared for the health of her baby.

42. Co-worker Staria Vassar saw that Stamper was not well.

43. Ms. Vassar intervened and guided Amanda to the rear of the office and away from Rathnaw.

44. Ms. Vassar told Defendant Rathnaw that Stamper was ill, which was obvious.

45. Defendant Rathnaw responded that if Stamper was ill, she needed to take that up with her doctor.

46. Amanda left work and drove herself to St. Mary's Hospital where she received emergency medical treatment for complications related to her pregnancy.

47. Amanda contacted Defendant Rathnaw from the hospital and told her that the hostile work environment was affecting her health and that of her unborn child.

48. Defendant Rathnaw wanted to know when she was coming back to work.

49. On March 7, 2025, and feeling pressured by Defendant Rathnaw, Stamper returned to work fitted with a remote heart monitor.

50. On March 7, 2025, Stamper sent Defendant Rathnaw a note from her doctor which discussed Stamper's high-risk pregnancy and related work restrictions.

51. Defendant Rathnaw ignored the restrictions.

52. Defendant Rathnaw ordered Amanda to come back to work because she needed the day off.

53. Stamper did as she was told and worked alone in the office.

54. 54. Stamper noticed that her paid time off (PTO) had been improperly deducted to suggest she left work early when she had not, and she reported the issue to HR.

55. On April 1, 2025, Stamper received only a 1% raise, the lowest percentage among similarly situated leasing agents.

56.     On April 10, 2025, Stamper spoke with Defendant Gorback about Defendant Rathnaw's discrimination, the toxic work environment, and the effect on her high-risk pregnancy.

57.     Defendant Gorback was unsympathetic and told Stamper that if she could not do her job because of her health, he would find a replacement who could.

58.     Defendant Gorback scolded Stamper for calling him to complain about Defendant Rathnaw.

59.     On April 11, 2025, Stamper contacted Human Resources (HR) to schedule an appointment with Defendant HR Director Mia Reinkensmyer.

60.     Stamper was told that she could not speak with Defendant Reinkensmyer until she first spoke with Defendant Gorback, which Stamper had already done with no success.

61.     During her pregnancy, Stamper asked Defendants Rathnaw and Gorback to order loose fitting maternity clothes to accommodate her pregnancy.

62.     Neither Rathnaw nor Gorback responded to Stamper's request for an accommodation.

63.     On April 12, 2025, Stamper emailed Defendant Kassab and Defendant Reinkensmyer about the pregnancy discrimination and retaliation at Westwood and her unsuccessful effort to meet with Defendant Reinkensmyer.

64. Defendant Reinkensmyer told Stamper she would schedule a meeting on Teams between Defendants Rathnaw, Gorback, Chrisman and Stamper to address Stamper's concerns.

65. On April 14, 2025, Stamper emailed Defendant Reinkensmyer and asked for an accommodation of maternity clothes.

66. Defendant Reinkensmyer instructed Defendant Rathnaw to accommodate Stamper and order maternity clothes.

67. On April 29, 2025, Defendant Gorback asked Stamper to sit with him and Defendant Rathnaw for the mediation.

68. Stamper explained to Defendant Reinkensmyer that she was not comfortable sitting alone with Gorback and Rathnaw.

69. Stamper's concern was ignored.

70. Gorback told Stamper that he would never forgive her for calling HR and said, *"Let's not forget that I hired your fiancé for you."*

71. Stamper told Gorback that her fiancé was irrelevant to the discussion.

72. Chrisman heard the exchange and instructed Gorbach to follow the chain of command.

73. Stamper used a portion of her PTO time for her pregnancy-related doctor visits and emergencies.

74.     Defendant Gorback frequently reminded Stamper that once she used up her PTO, she would be fired even if she left work for medical treatment.

75.     In July 2025, Defendant M. Shapiro hired Ruthie Robinson as a Leasing Agent.

76.     Ms. Robinson was not pregnant.

77.     Ruthie Robinson told Stamper that she was hired to chase Stamper off and was promised the Assistant Manager position if she was successful.

78.     Defendant Gorback fired Ms. Robinson once he learned that she had disclosed her unlawful purpose to Stamper.

79.     On September 14, 2025, Plaintiff Stamper was admitted to the hospital for complications related to her pregnancy.

80.     Stamper sent Defendant Rathnaw a text message to let her know of the medical emergency.

81.     On September 15, 2025, Defendant Rathnaw contacted Plaintiff at the hospital and pressured her to return to work.

82.     Defendant Gorback reminded Stamper her that he would find her replacement if her health interfered with her job.

83.     On September 17, 2025, under pressure from Defendants Gorback and Rathnaw, Stamper returned to work.

11

84. In the afternoon of September 17, 2025, Plaintiff met in Defendant Rathnaw's office for a Team meeting with Gorback.

85. Defendant Gorback told Stamper that her doctor appointments were an inconvenience for Rathnaw and that she was "stealing time."

86. Defendant Gorback threatened to write up if she continued to leave for medical treatment and possibly discharge her.

87. Stamper told Defendants Gorback and Rathnaw that she was not comfortable speaking with either of them alone and wanted to speak with Defendant Chrisman.

88. Stamper began experiencing contractions, abdominal pain, heavy breathing, and nausea while her heart monitor kept beeping.

89. Stamper went to the bathroom vomited and noticed spotting.

90. Co-worker Staria Vassar offered to drive Stamper home or the hospital.

91. Plaintiff Stamper initially declined the offer for fear of losing her job but later had Ms. Vassar driver her home where her fiancé drove Stamper to the hospital.

92. Defendant Chrisman called Stamper to ask what was going on and apologized for Defendants Gorback and Rathnaw's behavior,

12

93. Stamper told Defendant Chrisman that she was physically afraid of Defendant Gorback, that things had gotten out of hand and that she was tired of his constant threats.

94. Defendant Chrisman acknowledged Stamper's complaints and promised he would put a stop to the harassment.

95. Defendant Chrisman told Stamper she could begin her FMLA leave on September 17, 2025, and that her job would be there when she returned in December.

96. On September 18, 2025, Gorback called Stamper's phone multiple times and left a voice message, urging Stamper to come back to work.

97. On November 24, 2025, Stamper returned to Westland early from maternity leave.

98. Stamper was greeted d by Claudia Hernandez, a "travelling" leasing agent.

99. Hernandez asked Stamper, "Did you hear the news? That isn't your office anymore."

100. Hernandez told Stamper that her office and job duties had been given to Rana Zuhar, a woman who was not pregnant or Black and otherwise outside Stamper's protected class.

101. Stamper was also told that she would be sharing an office and small desk with Ms. Vassar.

13

102. Ms. Vassar told Stamper that one of them was going to be sent to Livonia to work three days a week.

103. Stamper breastfed her child and needed to pump milk at work.

104. Defendant Rathnaw handed Stamper a note from Defendant Gorback which instructed Stamper "if you need to pump throughout the day, you can either take a 30-minute lunch and two 15-minute break periods, or a one-hour lunch and no break periods."

105. Defendants Gorback and Rathnaw told Stamper to use the cafeteria/kitchen to pump milk for her baby when at Westland.

106. The kitchen is located in the middle of the Westland office and frequented by employees, vendors, contractors and others throughout the day.

107. A portion of the kitchen was fitted with porous bifold doors which had openings (i.e., slits or cracks between the doors) where anyone outside the makeshift screen could see Stamper pumping milk.

108. Stamper could not comfortably pump milk with an audience.

109. Stamper went home to pump milk during her one-hour lunch break.

110. Stamper was not allowed to pump milk after she returned from lunch having exhausted the one hour allowed by Gorbach.

111. On November 26, 2025, Stamper began working three days a week at Livonia (M/W/F) and two days a week at Westland (T/Th).

14

112. Defendants Gorback and Livonia Property Manager Spencer believed that Stamper was faking her need to pump milk and using it as a ruse.

113. Defendant Spencer told Stamper that *"they want me to hate you as much as everybody else does"* which was not the greeting Stamper was hoping for.

114. Other employees warned Stamper that Defendants Spencer and Gorback had been in and out of her office for no apparent reason.

115. On February 5, 2026, Stamper heard a strange sound in her office.

116. Stamper searched for the source of the sound and found a microphone embedded in the floorboard plaster on the side of her desk.

117. Stamper's discovery of the microphone was recorded on an overhead surveillance camera in her office.

118. Stamper was horrified but feared immediate discharge if she reported her discovery. (**Exhibit A**, Hidden Mic)

119. On February 11, 2026, Stamper had a conversation with Defendant Spencer at Livonia.

120. Stamper told Defendant Spencer that she was experiencing postpartum depression.

121. Stamper explained that returning to Westland three days a week reminded her of the office and duties she used to have but had no longer and worsened her depression.

122.   On February 13, 2026, Defendants Gorback and Spencer agreed to transfer Stamper to Livonia five days a week.

123.   Defendant Gorbach told Stamper to lock the office and use the backroom to lactate.

124.   Defendant Gorback told her "if you need to pump throughout the day, you can either take a 30-minute lunch and two 15-minute break periods, or a one-hour lunch and no break periods."

125.   Stamper learned that Defendant Spencer had spread scandalous rumors about Stamper to other employees, refused to buy Stamper office supplies and treated her differently from similarly situated employees outside her protected class.

126.   On April 1, 2026, Defendant Gorback held a meeting with Defendant Spencer and Stamper about Defendant Spencer's conduct.

127.   Defendant Gorback told Stamper about a surveillance camera installed in the ceiling for her safety but made no mention of the hidden microphone discovered by Stamper.

128.   On April 20, 2026, Defendants Gorback and Spencer marched into Stamper's office and told her she was about to be fired for tampering with the overhead surveillance cameras in her office.

129.   Stamper denied the accusation and demanded that Defendant Gorback contact Chrisman for a meeting.

130.   Defendant Gorback contacted Defendant Chrisman, and the group had a meeting on Teams.

131.   Defendant Gorback played the surveillance videotape of Stamper in her office and accused her of tampering with the surveillance camera, which was not true.

132.   Stamper denied any accusation and told Defendant Chrisman about her discovery of the illegal eavesdropping device Defendants Gorback and Spencer had planted in her office.

133.   Defendant Chrisman and Gorback Gaslit Stamper.

134.   Defendants Chrisman and Gorbach told her that she had consented to the company-wide eavesdropping practice when she signed her M. Shapiro Employee Handbook.

135.   This was not so.

136.   Defendant M. Shapiro's Employee Handbook made no reference to the installation, plant or use of microphones or other listening devices in offices and common areas.

137.   Defendant M. Shapiro had no written consent from Stamper, or anyone else, which consented to the illegal eavesdropping practice.

138.   Stamper explained that she had consulted with a lawyer and learned that the placement of the listening device in her office was illegal eavesdropping and a criminal act.

139.   Chrisman explained that he was unaware of the law and ended the meeting shortly thereafter.

140.   On April 21, 2026, Stamper contacted Defendant Reinkensmyer to report the worsening discrimination, retaliation, deteriorating conditions at work and illegal eavesdropping.

141.   Defendant Reinkensmyer told Stamper she would contact the IT technician who installed the hidden microphone, find the culprits and impose discipline.

142.   Stamper told Defendant Reinkensmyer that she was frightened of Defendant Gorback, feared he would physically harm her and that she did not want to be alone with him.

143.   Defendant Reinkensmyer promised Stamper that Gorback would be held accountable for his misconduct and she would not be left alone with Defendant Gorback.

144.   On April 22, 2026, Defendant Gorback approached Stamper while she was alone at work.

145.   Stamper was frightened. She did not want to be alone with Defendant Gorbach under any circumstances.

146.   Defendant Gorback told Stamper that her complaints about him had jeopardized his livelihood, but despite this, he wanted to "to put all of this behind us." Stamper was not reassured.

147.   Defendant Gorback explained that he was unaware of the hidden microphone and that Defendant Spencer was to blame for its installation.

148.   Defendant Gorback then told Stamper that Defendant Spencer would begin to sit with her during lunch and that she needed permission from Spencer for her lunch break.

149.   On April 23, 2026, Defendant Spencer told Stamper that Defendant Gorback was the one to blame for the installation of the hidden listening device.

150.   Defendant Spencer also told Stamper that Defendant Gorback ordered Spencer to "babysit" Stamper during lunch so Stamper would quit her job.

151.   An IT technician removed the microphone and told Stamper that Defendants Gorback *and* Spencer had instructed him to install the hidden microphone.

152.   Even after Stamper's discovery, Defendants Gorback and Spencer continued to make references about Stamper's private life that could only be heard if more hidden but undiscovered listening devices had been planted in her office.

19

153. Because Spencer sat with Stamper during her lactation lunch period, Stamper had to close the door she had left open for ventilation when she needed to pump milk at Livonia.

154. With the door closed because of Spencer's presence, Stamper had no circulating air to breathe, was hot and uncomfortable.

155. Stamper complained and was given a chair, which she assembled with a maintenance worker, and a fan.

156. The fan often broke down, and the chair did nothing to relieve the ventilation problem.

157. Stamper complained to Gorbach who said there was nothing he could do because of the structure of the building.

158. With no other alternative, Stamper pumped milk for her baby in a parking lot with the car windows covered during her break.

159. On May 12, 2026, Defendant Spencer and Maintenance Supervisor Jonathan Phillips told Lyons to toss out a broken old refrigerator manufactured in 1998 from Unit 117, which he did.

160. Later in the day, Defendant Spencer scolded Lyons for disposing the old refrigerator.

161. Lyons suspected that race or something else was behind her conduct and told Defendant Spencer that he was uncomfortable with how she was treating him.

162. On May 19, 2026, Defendants Gorback and Spencer, in the presence of supervisor Phillips, accused Lyons of stealing the refrigerator.

163. Maintenance Supervisor Phillips told Defendants Gorback and Spencer that Lyons had properly disposed of the refrigerator as ordered.

164. Lyons learned from Phillips that Gorback and Spencer had told him to sabotage Lyons' work.

165. Defendants Reinkensmyer and Chrisman had pressured Phillips to lie and say that refrigerator manufactured in 1998 was brand new, which Phillips could not do.

166. On May 20, 2026. Stamper contacted the Livonia police to report her suspicions of illegal eavesdropping and wiretapping.

167. On May 21, 2026, Lyons was written up by Spencer.

168. Afterwards, Stamper went to Defendant M. Shapiro's corporate offices and asked to see Defendants Kassab and Reinkensmyer to let them know that she had just filed a police report against Defendant Gorback.

169. Stamper tried to hand a copy of the police report to the front desk receptionist and to office manager Selena Fischer, neither of whom would accept a copy.

170. Stamper was told that Defendants Kassab and Reinkensmyer were unable to see her.

171. On May 21, 2026, Livonia PD contacted Defendants Gorback and Spencer about their investigation and told them not to come within 100 feet of Stamper.

172. On May 21, 2026, Lyons was written up was for his *"failure to obey,"* which Lyon's believed to be racially insensitive.

173. None of Stamper's complaints of unlawful activity were investigated by Defendants.

174. No remedial or corrective measures were considered, adopted or implemented by Defendants to stop the discrimination, retaliation and harassment despite notice.

175. None of the individual offenders, and/or those who authorized, acquiesced, or ratified their actions were disciplined, demoted or involuntarily terminated, other than Chrisman who "resigned."

176. Stamper contacted the Equal Employment Opportunity Commission (EEOC) to report her sex/race/pregnancy discrimination and retaliation.

22

177. Plaintiff Lyons also contacted the EEOC to file a Charge of Discrimination for third-party retaliation.

178. On May 29, 2026, Plaintiffs' counsel notified Defendants about the violations of Plaintiffs Stamper's and Lyon's rights.

179. The notice included written guidelines from the Department of Labor (DOL) to facilitate compliance with the *PUMP Act*.

180. When Stamper returned to work on Monday June 1, 2026, Defendant Spencer falsely accused her of tampering with the internet.

181. A few hours later Defendant Spencer came to stamper's office, stood in front of her desk and asked why Stamper wasn't in her car pumping milk.

182. Stamper explained that with the office being closed she wanted to pump milk inside and not outside in a parking lot.

183. Defendant Spencer told Stamper she would have to go to her car to pump.

184. Defendant Spencer also told Stamper that she knew all about her "fake lawsuit," ridiculed Stamper and told Stamper she was too poor to afford a lawyer.

185. Defendant M. Shapiro has since admitted that the use of microphones to record the personal and private conversations of visitors, employees, contractors, vendors, tenants, and others without their knowledge or consent is company policy and widespread.

23

186. On June 8, 2026, Stamper notified Defendant Erica Spencer that she would not be at work because of a medical emergency.

187. Defendant Spencer acknowledged Stamper and thanked her.

188. Defendants subsequently threatened Stamper with discharge if she used any more PTO for medical emergencies because her PTO had been exhausted.

189. Stamper informed Defendants that her postpartum depression is a disability recognized under state and federal law, *infra*.

190. Stamper contacted HR to request an accommodation i.e., unpaid intermittent leave to see her doctor for her postpartum depression when she needed.

191. Defendant M. Shapiro has not responded to Stamper's request for a reasonable accommodation, has not engaged in the interactive process and has not taken any steps to cure the statutory violations above and have made working conditions intolerable.

## COUNT I:

### DISCRIMINATION AND RETALIATION IN
### VIOLATION OF *MCL § 37.2201* and RETALIATION *MCL § 37.2701*
### BASED ON SEX, PREGNANCY AND RACE

192. Plaintiff Amanda Stamper reasserts each paragraph above word for word.

193. Defendants M. Shapiro, Rathnaw, Gorback, Spencer, Reinkensmyer, and Chrisman, are all "employers" covered under the *Elliot Larsen Civil Rights Act (ELCRA)*.

194. Stamper is an "employee" covered under the *ELCRA*.

195. The *ELCRA* prohibits an employer from discriminating against an employee based on "Sex" or "Race."

196. The *ELCRA* defines "Sex" to include pregnancy, childbirth, …., or a related medical condition."

197. Under the *ELCRA* an employer may not:

> (d) Treat an individual affected by pregnancy, childbirth, the termination of a pregnancy, or a related medical condition differently for any employment-related purpose from another individual who is not so affected but similar in ability or inability to work, without regard to the source of any condition affecting the other individual's ability or inability to work.

198. ELCRA forbids an employer or its agent from retaliating against an employee because the employee exercised her rights. *Mich Comp. Laws 37.2701*

199. Defendants Shapiro, Gorback, Rathnaw, Spencer, Chrisman, Kassab and Reinkensmyer discriminated and/or retaliated against Stamper because of her protected status and activity related to her pregnancy and related complications by, among other things: creating a hostile environment, threatening her job, refusing to allow her to wear maternity clothes at work; interfering with leave; wrongly deducting her PTO time; failing to pay her proper referral fees and bonuses; taking

25

away her private office and reducing her duties upon her return from maternity leave, making working conditions unbearable, willfully failing to comply with the *PUMP Act,* eavesdropping on Stamper's private conversations, wiretapping to listen in on Stamper's private conversations, threatening the job of Lamar Lyons, falsely accusing Lamar Lyons of theft, having Spencer "babysit" Stamper, and other conduct explained in the allegations above.

200. Defendants' M. Shapiro, Gorback, Rathnaw, Spencer, Chrisman, Reinkensmyer and/or Kassab's unlawful conduct altered the terms and conditions of Stamper and Lyon's respective employment and created an oppressive, discriminatory, and retaliatory environment.

201. Defendants' M. Shapiro, Gorback, Rathnaw, Spencer, Chrisman, Reinkensmyer and/or Kassab had a propensity, inclination, and disposition to discriminate against other female employees because of pregnancy, related medical complications, and the need to pump milk.

202. Defendants failed to investigate any of Stamper's complaints or adopt remedial measures to stop them for recurring thereby endorsing the unlawful conduct which continued unabated.

203. As a direct and proximate result of Defendants violation of Stamper's *ELCRA* rights, Stamper experienced pain, suffering, embarrassment, humiliation, anger, emotional distress, depression, agony, fear of losing her child, aggravation of

26

preexisting conditions, loss of the enjoyments of life, physical manifestation associated with mental distress, reputational harm, economic loss, back pay, front pay and other injuries that will continue to develop during and beyond this litigation.

## COUNT II:

### VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

204.   Plaintiff Stamper reasserts each paragraph above word for word.

205.   Defendants are employers covered under Michigan's Persons With Disabilities Civil Rights Act (PWDCRA) under *MCL 37;1101, et. seq.*

206.   Stamper is an employee covered under the PWDCRA.

207.   Stamper suffered from postpartum depression which impacted one or more life activities and recognized disability.

208.   Stamper told Gorback, Spencer and Reinkensmyer that she was suffering from postpartum depression.

209.   Stamper sought intermittent leave when she needed to see her doctor for treatment of her disability.

210.   Gorback, Spencer and Reinkensmyer refused to engage in the interactive process to accommodate Stamper's disability.

211.   Instead, Defendants threatened Stamper that if she took any more doctor appointments for treatment of postpartum depression, she would be fired.

27

212.   As a direct and proximate result of Defendants violation of Stamper's *PWDCRA* rights, Stamper experienced pain, suffering, embarrassment, humiliation, anger, emotional distress, depression, agony, fear of losing her child, aggravation of preexisting conditions, loss of the enjoyments of life, physical manifestation associated with mental distress, reputational harm, economic loss, back pay, front pay and other injuries that will continue to develop during and beyond this litigation.

## COUNT III:

### DEFENDANTS' VIOLATION OF THE
### *FEDERAL WIRETAP ACT* BEING, *18 U.S.C. §§ 2510-2522* AND
### *MICHIGAN'S EAVESDROPPING ACT MCL § 750.539A, ET SEQ.*

213.   Stamper reasserts each paragraph above word for word.

214.   Defendants M. Shapiro, Gorback, Rathnaw, Spencer, Chrisman, Reinkensmyer, and Kassab acting individually and/or in concert, directed, installed, planted and/or paid for installation of a hidden listening device or devices in Stamper's workspace to monitor her private conversations without her knowledge, authorization or consent, in violation of the *Federal Wiretap Act being, 18 U.S.C. §§ 2510-2522* and *Michigan's Eavesdropping Act MCL § 750.539a, et seq.*

215.   *18 U.S.C.S. § 2520* makes a civil action available to a person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of the *Electronic Communications Privacy Act (ECPA or Wiretap Act), 18 U.S.C.S. §§ 2510-2521.*

28

216.   *MCL § 750.539h* provides:

> Any parties to any conversation upon which eavesdropping is practiced contrary to this act shall be entitled to the following civil remedies: (a) An injunction by a court of record prohibiting further eavesdropping. (b) All actual damages against the person who eavesdrops. (c) Punitive damages as determined by the court or by a jury

217.   Plaintiff Stamper did not consent, authorize, or give permission to anyone to surreptitiously eavesdrop and listen in on her private conversations and communications.

218.   No exception allowed any Defendant to eavesdrop or otherwise listen in on Stamper's personal and private conversations.

219.   Stamper's rights under the above eavesdropping and wiretapping statutes were violated when Defendants Gorback and Spencer had a microphone installed in Stamper's office without her knowledge, permission, or consent.

220.   The placement of hidden microphones, eavesdropping and wiretapping devices to listen in on and/or record the personal and private conversations of employees, contractors, vendors, visitors and others is a companywide policy which violated Stamper's rights and anyone else whose private conversations were surreptitiously recorded.

221.   As a direct and proximate result of Defendants violation of Stamper's rights under *18 U.S.C. §§ 2510-2522* and *Michigan's Eavesdropping Act MCL § 750.539a, et seq*, Stamper experienced pain, suffering, embarrassment, humiliation,

29

anger, emotional distress, depression, agony, fear of losing her child, aggravation of preexisting conditions, loss of the enjoyments of life, physical manifestation associated with mental distress, reputational harm, economic loss, back pay, front pay and other injuries that will continue to develop during and beyond this litigation.

## COUNT IV:

## INVASION OF PRIVACY

222.   Plaintiff Amanda Stamper reasserts each paragraph above word for word.

223.   Defendants intentionally intruded upon Amanda Stamper's solitude and seclusion.

224.   On February 5, 2026, Amanda Stamper discovered a hidden microphone embedded in the floorboard plaster on the side of her desk in her office.

225.   Defendants Gorback and Spencer instructed an IT technician to install the hidden listening device in Amanda Stamper's office without her knowledge or consent.

226.   The hidden microphone was used to intercept and record Amanda Stamper's private conversations and activities.

227.   Even after Stamper discovered the hidden microphone, Defendants Gorback and Spencer continued to make references about Amanda Stamper's private

30

life that could only have been known if additional undiscovered listening devices remained in her office.

228. Defendants falsely claimed Amanda Stamper had consented to the surveillance by signing the Employee Handbook, when the Handbook made no mention of hidden listening devices.

229. The intrusion occurred in spaces where Amanda Stamper was pumping breast milk, an intensely private activity.

230. The intrusion would be highly offensive to a reasonable person.

231. Secretly recording someone during private moments, especially while engaged in intimate bodily functions like pumping breast milk, is a severe violation of privacy, as is listening in on private conversations with family and others.

232. The intrusion would be highly offensive to any reasonable person.

233. Amanda Stamper's private conversations in her office were matters she reasonably expected to remain private.

234. As a direct and proximate result of Defendants violation of ab invasion of Stamper's privacy rights, Stamper experienced pain, suffering, embarrassment, humiliation, anger, emotional distress, depression, agony, fear of losing her child, aggravation of preexisting conditions, loss of the enjoyments of life, physical manifestation associated with mental distress, reputational harm, economic loss,

31

back pay, front pay and other injuries that will continue to develop during and beyond this litigation.

## COUNT V:

### FMLA INTERFERENCE AND RETALIATION

235.   Plaintiff Stamper reasserts each paragraph above word for word.

236.   Defendant M. Shapiro is an "employer" covered by the FMLA.

237.   Plaintiff Stamper is an "employee" covered under the FMLA.

238.   Plaintiff Stamper engaged in protected activity under the FMLA when she asked for maternity leave.

239.   Defendant M. Shapiro knew of Stamper's protected activity.

240.   Defendant M. Shapiro, by and through the individual Defendants, intentionally and deliberately interfered with Plaintiff Stamper's FMLA rights when they demanded she return to work during her leave and retaliated against her because she exercised her rights under the FMLA, *i.e.,* refused her a safe, secure, quite place available to pump milk despite actual notice of the failure and specific written instructions from the Department of Labor (DOL)  for compliance), questioned her need for medical treatment and other unlawful treatment.

241.   As a direct and proximate result of Defendant Shapiro's violation of Stamper's FMLA rights, Stamper experienced pain, suffering, embarrassment, humiliation, anger, emotional distress, depression, agony, fear of losing her child,

32

aggravation of preexisting conditions, loss of the enjoyments of life, reputational harm, economic loss, back pay and other injuries that will continue to develop during and beyond this litigation.

**COUNT VI:**

**VIOLATION OF *THE PUMP ACT***

242. Plaintiff Stamper reasserts each paragraph above word for word.

243. Defendant M. Shapiro is an "employer" under the *PUMP Act.*

244. Plaintiff Stamper is an "employee" under the *PUMP Act.*

245. Under the *PUMP Act*, Defendant M. Shapiro was required to provide Stamper and other nursing employees with "reasonable break time" (i.e., at least 15 minutes) each time she needed to express breast milk for at least one year after the child's birth. *29 USCS § § 218d and 5.09*

246. Under the *PUMP Act,* Defendant M. Shapiro was also required to provide a space, other than a bathroom, which is shielded from view and free from intrusion by coworkers and the public, for the purpose of expressing breast milk. *29 USCS § 218d*

247. Defendant M. Shapiro denied Plaintiff Stamper a 15-minute block in a private, quiet safe area each day to express milk for her newborn.

248. The common cafeteria/kitchen did not comply with the *PUMP* Act.

249. The filthy unventilated storage area at Livonia Apartments did not comply with the *PUMP Act.*

250. Plaintiff Stamper's car in the parking lot did not comply with the *PUMP Act.*

251. Plaintiff Stamper was retaliated against by Defendant M. Shapiro because she exercised her rights under the *PUMP Act* in a manner that would deter a person of ordinary firmness from speaking out.

252. Defendants Gorback and Rathnaw, with the knowledge and approval of Defendants Reinkemeyer, Chrisman and Kassab, denied Stamper a private, secure, safe space to lactate and pump milk whenever needed as mandated by the *Providing Urgent Mother's Protection (PUMP) for Nursing Mothers Act, being, 29 U.S.C.§ 207(r).*

253. As a direct and proximate result of Defendant M. Shapiro's violation of Stamper's *PUMP* rights Stamper experienced pain, suffering, embarrassment, humiliation, anger, emotional distress, depression, agony, fear of losing her child, aggravation of preexisting conditions, loss of the enjoyments of life, physical manifestation associated with mental distress, reputational harm, economic loss, back pay, front pay and other injuries that will continue to develop during and beyond this litigation..

## COUNT VII:

## VIOLATION OF THE WHISTLEBLOWER PROTECTION ACT

254.   Plaintiff Stamper reasserts each paragraph above word for word.

255.   All Defendants are "employers" under Michigan's Whistleblower's Protection Act, being MCL 15.361. et. seq. (the "WPA")

256.   Plaintiff Stamper is an "employee" covered under the WPA.

257.   Plaintiff Stamper engaged in protected activity under the WPA after she told Defendants she had contacted a lawyer and intended to report the eavesdropping to Livonia police.

258.   Defendants retaliated against Plaintiff Stamper when they threatened her job threatened the job of her fiancé, denied her the benefits of her employment, harassed and pressured Stamper to quit.

259.   A causal connection exists between Stamper's protected activity and the adverse employment action.

260.   As a direct and proximate result of Defendants violation of Stamper's WPA rights, Stamper experienced pain, suffering, embarrassment, humiliation, anger, emotional distress, depression, agony, fear of losing her child, aggravation of preexisting conditions, loss of the enjoyments of life, physical manifestation associated with mental distress, reputational harm, economic loss, back pay, front pay and other injuries that will continue to develop during and beyond this litigation.

35

## COUNT VIII:

### THIRD PARTY RETALIATION IN VIOLATION OF
### THE *ELCRA, FMLA, the PUMP ACT, PWDCRA* AND WPA
### AS TO LAMAR LYONS

261.   Plaintiff Lamar Lyons reasserts each paragraph above word for word.

262.   Plaintiff Lyons was and remains an employee protected under the ELCRA, FMLA, the PUMP Act and WPA.

263.   Defendants knew that Plaintiffs Lyons was Stamper's fiancé and threatened to fire Lyons in retaliation for Stamper's assertion of the rights guaranteed her under each of the statutes cited above.

264.   Defendants wrote Lyons up despite the lack of any policy violations and imposed adverse employment actions on him such that an employee of reasonable firmness would be deterred from speaking out.

265.   Defendants deliberately targeted Lyons to hurt Stamper and chill her and other employees from asserting their statutory rights.

266.   A causal connection between Lyons' protected activity and the adverse employment actions visited upon him by Defendants, individually and collectively.

267.   As a direct and proximate result of Defendants' violation of Lyons' third-party rights under *the ELCRA, FMLA, the PUMP Act,* and *WPA,* Lyons experienced pain, suffering, embarrassment, humiliation, anger, emotional distress, depression, agony, fear of losing his child, aggravation of preexisting conditions,

36

loss of the enjoyments of life, physical manifestation associated with mental distress, reputational harm, economic loss, back pay, front pay and other injuries that will continue to develop during and beyond this litigation..

## COUNT IX:

### CIVIL CONSPIRACY

268. Plaintiffs Stamper and Lyons reassert each paragraph above word for word.

269. Defendants M. Shapiro, Gorback, Rathnaw, Spencer, Chrisman, Kassab and Reinkensmyer agreed and conspired with and among each other to violate Stamper and Lyons' rights as described above.

270. Defendants M. Shapiro, Gorback, Rathnaw, Spencer, Chrisman, Kassab and Reinkensmyer aimed to achieve an unlawful purpose or lawful purpose through unlawful means.

271. Defendants M. Shapiro, Gorback, Rathnaw, Spencer, Chrisman, Kassab and Reinkensmyer committed acts in furtherance of the conspiracy, including eavesdropping, wiretapping, threatening the job of her fiancé and pressuring Stamper to quit.

272. As a direct and proximate result of Defendant Shapiro, Gorback, Rathnaw, Spencer, Chrisman, Kassab and Reinkensmyer's civil conspiracy, Stamper and Lyons experienced pain, suffering, embarrassment, humiliation, anger,

37

emotional distress, depression, agony, fear of losing her child, aggravation of preexisting conditions, loss of the enjoyments of life, physical manifestation associated with mental distress, reputational harm, economic loss, back pay, front pay and other injuries that will continue to develop during and beyond this litigation.

## COUNT X

**CIVIL RICO VIOLATION IN VIOLATION OF *18 USCS § 1962*
(AGAINST ALL DEFENDANTS)**

273.   Plaintiff Amanda Stamper reasserts each paragraph above word for word.

274.   Defendants conducted an enterprise as defined under *18 U.S.C. §§ 1961-1968, etc. seq.*

275.   M. Shapiro is an enterprise engaged in interstate commerce through its property management business.

276.   Defendants Gorback, Spencer, Chrisman, Reinkensmyer and Kassab were employed by or associated with M. Shapiro Management Company.

277.   Defendants used telephone wires and communications which impact interstate commerce.

278.   Defendants conducted the enterprise's affairs through a pattern of racketeering activity.

279. Defendants engaged in multiple wiretap violations of *18 U.S.C. § 2511* when they installed a hidden microphone in Stamper's office for the purpose of intercepting her oral communications without her consent.

280. Defendants used the hidden listening device to intentionally intercept Stamper's oral communications in her office on multiple occasions from at least February 2026 through at least May 2026.

281. After Stamper discovered the hidden microphone on February 5, 2026, Defendants continued to intercept her communications, as evidenced by their knowledge of her private affairs that could only have been obtained through continued surveillance.

282. The interceptions were intentional, as Defendants deliberately installed the devices and used them to monitor Stamper and other persons.

283. Stamper did not consent to the interception of her oral communications.

284. The interceptions were accomplished through use of electronic devices, specifically hidden microphones and listening devices.

285. These predicate acts occurred within a ten-year period from February 2026 through May 2026, establishing a pattern of racketeering activity.

286. The predicate acts were related, as all involved surveillance of Stamper, and posed a threat of continued criminal activity.

287.   Defendant M. Shapiro admitted that the policy of listening to the private conversations of its employees and others without their knowledge or consent is companywide and not isolated to Stamper.

288.   Defendant M. Shapiro has unlawfully wiretapped every past and current employee, contractors, vendor, visitor, tenant and anyone who visited M. Shapiro's premises.

289.   The pattern of racketeering activity caused injury to Stamper's business or property, including lost wages.

290.   Stamper was injured in her business or property as a result of the racketeering activity.

291.   Stamper suffered economic damages including lost wages and costs of litigation.

292.   Stamper suffered damage to her property interest in her privacy rights.

293.   Stamper suffered emotional distress damages that are compensable as property injury.

294.   Amanda Stamper's injuries were directly and proximately caused by the pattern of racketeering activity.

295.   The enterprise, M. Shapiro, benefited from the racketeering activity by obtaining information about Stamper that was used to retaliate against her and attempt to force her to quit.

296.   As a direct and proximate result of Defendants; RICO violations, Stamper experienced pain, suffering, embarrassment, humiliation, anger, emotional distress, depression, agony, fear of losing her child, aggravation of preexisting conditions, loss of the enjoyments of life, physical manifestation associated with mental distress, reputational harm, economic loss, back pay, front pay and other injuries that will continue to develop during and beyond this litigation.

## REQUESTED RELIEF

Accordingly, Plaintiffs ask this Court to enter a judgment against Defendants Shapiro, including, but not limited to:

**Legal Relief:**

A.   Award compensatory damages for lost wages, emotional distress, and physical harm.

B.   Award for punitive damages as permitted under common law, Michigan and federal statutes referenced above, including those allowed *18 U.S.C. §§ 2510-2522* and *Michigan's Eavesdropping Act MCL § 750.539a, et seq*,

C.   Award compensatory damages, punitive damages, treble damages, and

D.   Award liquidated damages as provided by the *FMLA*, the *PUMP Act* and other applicable statutes.

41

E.    Any other damages contemplated by each of the statutes referenced herein, including, attorney fees, interest, and costs.

**Equitable Relief:**

A.    Order injunctive relief to prevent further discrimination and retaliation against Plaintiff.

B.    Order declaratory relief for Defendants' violation of RICO.

C.    Reinstate and fully restore Plaintiffs Stamper and Lyons to their proper positions, with back pay and removal of any disciplines or write ups from their respective files.

D.    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

*s/ Todd Russell Perkins*
Todd Russell Perkins (P55623)
PERKINS LAW GROUP, PLLC
Attorneys for Plaintiff
409 E. Jefferson, Floor 6
Detroit, MI 48226
313-964-1702
tperkins@perkinslawgroup.net

Dated:  June 22, 2026

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial of this cause of action.

Respectfully submitted,

<u>s/ Todd Russell Perkins</u>
Todd Russell Perkins (P55623)
PERKINS LAW GROUP, PLLC
Attorneys for Plaintiff
409 E. Jefferson, Floor 6
Detroit, MI 48226
313-964-1702
tperkins@perkinslawgroup.net

Dated:  June 22, 2026

43